UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

RICARDO JOSE LOPEZ,                          Case No. 3:11-cv-00635-MMD-CBC

                        Petitioner,               ORDER

        v.

FILSON, et al.,

                        Respondents.

This counseled habeas matter pursuant to 28 U.S.C. § 2254 challenging Petitioner Ricardo Jose Lopez's conviction of murder in the first degree with the use of a deadly weapon and attempted murder with use of a deadly weapon (ECF No. 67; Exhibit ("Ex.") 37; Ex. 48)[1] comes before the Court for consideration of the merits of the surviving claims of the second amended petition (ECF No. 67). Respondents have answered (ECF No. 88), and Petitioner has replied (ECF No. 89).

I.      **BACKGROUND**

        On October 11, 2003, Petitioner shot Gustavo Gonzalez and Francisco Perez, Jr. in the parking lot of Hurricane Harry's, killing Gonzalez and injuring Perez. (See Ex. 8; Ex. 33 (Tr. 28-31).) After fleeing the scene and a brief pursuit, Petitioner was arrested and charged with murder and attempted murder.

        Initially, Petitioner was represented by the public defender. (See Ex. 1.) But after more than two years, and just months before the latest trial setting, Petitioner retained Robert Lucherini to represent him. (See Ex. 19.) Although Lucherini moved to appear on Petitioner's behalf on March 28, 2006 (id.), a representative indicated just a week later that he could no longer do so. (Ex. 20.) By April 20, 2006, however, Lucherini was again

_____

[1]The exhibits cited in this order, making up the relevant state court record, are located at ECF Nos. 9-13 & 39.

appearing on Petitioner's behalf, telling the court that although he had "a lot of work to do real quickly" he could be ready for the trial set for June 5, 2006. (Ex. 21.) At calendar call on May 30, 2006, however, Lucherini sought a continuance due to other court engagements. The court continued the trial to June 19, 2006, but indicated it would continue it further only if both parties agreed. (Ex. 22.) There was apparently no agreement, as trial commenced on June 19, 2006. At trial, the following relevant evidence was presented.

At around 2:30 a.m. on October 11, 2003, Gustavo Gonzalez, Luis Galvan, and Francisco Perez were leaving Hurricane Harry's in Las Vegas and walking toward Gonzalez's car. (Ex. 33 (Tr. 92-94, 134).) As Gonzalez stepped off into the bushes, a car pulled into the lot behind Galvan and Perez. (*Id.* at Tr. 94-96, 136.) The car was driven by Crystal Sanchez and contained her boyfriend, Jose Lizaola in front, and Petitioner in back. (*Id.* at 94-96; Ex. 34 (Tr. 88-89).) As the car drove by, Petitioner flashed a gun. (Ex. 33 (Tr. 94-96, 136).) Galvan was not paying attention and did not see the gun but heard Perez say, "Hey that guy just flashed a gun at me." (*Id.* at 135.)

Perez approached the group, now out of the car, and asked, "Why you showing me that gun?" (Ex. 33 (Tr. 94-96, 135).) Petitioner said they were from Los Angeles, to which Perez replied, "[W]ell we have no problem with your kind." (*Id. at* 136.) While Lizaola said that they "weren't looking to gang-bang or anything like that," he started to unbutton his cuffs and walk toward the group. (Ex. 34 (Tr. 98-101).) Sanchez stopped him, which diffused the tension, and after a short conversation, they all shook hands and parted ways, saying, "[T]hat's right, there's nothing to fight about it, nobody's gang banging." (Ex. 33 (Tr. 94-97, 136); Ex. 34 (Tr. 90, 101).)

As Gonzalez, Perez, and Galvan walked to their car, Gonzalez asked what had happened. Galvan and Perez said Petitioner had pulled a gun but everything was fine. (Ex. 33 (Tr. 125, 137).) As they walked, they sounded angry, and one of them said, "I'm not afraid of those MFs." (Ex. 34 (Tr. 54-55).)

///

On the way out, Gonzalez pulled his car up to the other group, which was standing near Sanchez's car. (Ex. 33 (Tr. 137); *see also id.* at 98-99; Ex. 34 (Tr. 90-91).) Petitioner was on the phone with his girlfriend. (Ex. 34 (Tr. 90).) Gonzalez rolled down his window and said either, "Why you pulling a gun on your own race?" or "you f[***]ing Mexicans." (Ex. 33 (Tr. 137); *see also id.* at 98-99; Ex. 34 (Tr. 91, 135-36).) Petitioner responded either, "I'm not Mexican. F[***] Mexicans" or "I'm not Mexican; I'm Cuban." (Ex. 33 (Tr. 138); Ex. 34 (Tr. 135-36).) Lizaola said something like, "What is it that you want?" (Ex. 34 (Tr. 102-03).) In the back seat, Perez could be heard saying "Let's go, you know, it's okay, it's all squashed, it's all forgotten" but Gonzalez refused, as though he didn't want to leave it at that. (*Id.* at 91.)

Sanchez was closest to Gonzalez's car; Petitioner was behind her. (*Id.* at 105.) Sanchez watched as Gonzalez turned around to tell Perez "no," and at this point his hands vanished from her view. (*Id.* at 103.) He began looking down at his lap, which caused Sanchez to fear she was going to be shot. (*Id.* at 103-04.)

Although Sanchez testified that Petitioner was not really paying attention during this time, Galvan testified that it was Petitioner who was escalating the confrontation by holding his hand up to his gun, which was in his waistband, and repeatedly saying, "Do you want some?" (Ex. 33 (Tr. 149-50); Ex. 34 (Tr. 105).) According to Perez and Galvan, no one in their car had a weapon or claimed to have a weapon. (Ex. 33 (Tr. 103, 139, 141).)

Perez testified he could not hear the conversation between Gonzalez and Petitioner, but he got out of the car and said, "I thought we squashed this." (*Id.* at 99-100, 138.) According to Sanchez, Perez said something like, "[W]hat, punk, what are you going to do, or what do you want to do?" (Ex. 34 (Tr. 105).) Sanchez testified that Perez jumped out of the car and came running quickly towards the group, throwing his hands up in the air and trying to start a confrontation. (*Id.* at 91.) But Perez testified that he was not rushing the group, and that his hands were up and empty. (Ex. 33 (Tr. 100, 138).)

///

Within seconds, Petitioner opened fire. (Ex. 33 (Tr. 99-100, 138); Ex. 34 (Tr. 105-06).) Perez was hit just below the belly button. (Ex. 33 (Tr. 101-02).) Perez hopped back into the car and said, "I've been shot. . . [L]et's go." (*Id.* at 101-02, 138.) Gonzalez turned around to look at what had happened, but before he was able to turn back around, Petitioner had walked up to the driver's side window and fired two shots directly into Gonzalez. (*Id.* at 35, 101-02, 138.) Galvan testified that at the time he was shot, Gonzalez's hands were on the steering wheel. (*Id.* at 102, 139.)

Gonzalez got quiet and the car moved slowly up onto a curb. (*Id.* at 39, 103, 139-40.) Petitioner jumped into the other car, which drove off. (*Id.* at 104.) Following pursuit by police first in their vehicles and then on foot, Petitioner was apprehended a short time later, arrested and charged. (*See id.* at 40; Ex. 34 (Tr. 170-91).)

Nearly the entire incident was caught on camera by an officer who was conducting surveillance nearby. (*See* Ex. 33 (Tr. 28-31, 45).) Although the video at times is not entirely in focus, it clearly, and importantly, shows that when Perez got out of the car, he was not moving quickly and his hands were up and empty. (*See* Ex. 109.) It also shows that three seconds elapsed between the shot fired at Perez and the second two shots fired at Gonzalez. It also shows that Petitioner lingered near Gonzalez's car for five seconds after the second two shots, before turning around and moving—not quickly—toward Sanchez's car. (*See id.*) According to the officer who witnessed the event, it appeared that after Petitioner shot Gonzalez, he stepped away from the vehicle for a moment and then stepped backed to look inside. (Ex. 33 (Tr. 36-37).)

During closing arguments, the prosecutor argued:

> Now, shooting someone, alone, indicates an intent to kill. When you point a gun at someone and fire, your intention is to kill – to kill them. But more importantly in this case, where the defendant shot at Francisco is important. He didn't shoot at his feet. He didn't shoot in the air. He didn't shoot a warning shot. He shot square into his body; and it's just by luck that the bullet hit the belt buckle and button of Francisco's pants and he didn't die. The defendant definitely had the intent to kill when he raised up a gun and shot directly into Francisco's body.

4

(Ex. 35 at 29.) The prosecutor also asserted that Gonzalez's "conduct in addressing [Petitioner] and saying that he didn't like the fact that he had flashed a gun at his friends is not something that legally changes the conduct of [Petitioner]." (*Id.* at 26.)

Following deliberations, the jury returned a verdict finding Petitioner guilty of attempt murder with use of a deadly weapon and first-degree murder with use of a deadly weapon. (Ex. 37.) The penalty phase then commenced. (Ex. 38.)

During the penalty phase, the State presented evidence of Petitioner's criminal history, including a conviction for malicious destruction of property in connection with an uprising at a youth detention facility. (*Id.* at 10.) Evidence also was presented that Petitioner had been arrested on April 8, 1998, for kidnapping, kidnapping with intent to commit sexual assault, sexual assault victim under 16, assault with a deadly weapon, switchblade, harassment first offense, switchblade, kidnapping conspirator, open or gross lewdness and disorderly conduct, but that ultimately he was adjudicated of only harassment and disorderly conduct, sentenced to probation, and the remaining charges dismissed. (*Id.* at 12.)

The defense presented one witness: Petitioner's uncle, Eduardo Rosas. Rosas explained that Petitioner had a hard home life because his mother used a lot of drugs, the men in her life would beat Petitioner, and there were lots of fights, yelling, and screaming in Petitioner's homes. (*Id.* at 39-40.) He also testified that Petitioner's dad left when Petitioner was 4 or 5 after he discovered that Petitioner's mom was having an affair and attacked her and her lover with a machete. (*Id.* at 41.)

In closing arguments, the State pushed for the maximum sentence on the grounds that Petitioner had a significant juvenile criminal history and had already been given several opportunities to turn his life around. (*Id.* at 60-63.) Defense counsel argued that Petitioner's life and actions were the result of his difficult home life and urged the jury to give him the hope of one day being released. (*Id.* at 66-68.) The jury was then instructed to elect among three options: (1) life without the possibility of parole; (2) life with the possibility of parole after 40 years; and (3) a definite term of 100 years with the possibility

of parole after 40 years. (Ex. 39.) After deliberations, the jury returned a verdict sentencing Petitioner to life in prison without the possibility of parole. (Ex. 40.)

Following a sentencing hearing before the trial court, the court entered judgment of conviction sentencing Petitioner to consecutive terms of life without the possibility of parole on the first degree murder count and deadly weapon enhancement, and two consecutive terms of 53 to 240 months on the attempted murder count and deadly weapon enhancement. (Exs. 42, 43, 48.)

Petitioner thereafter pursued direct appeal and postconviction habeas claims for relief in state court.[2] Having been denied relief on all fronts, he now seeks relief via the instant petition for relief pursuant to 28 U.S.C. § 2254.

## II.    STANDARDS

### A.    Merits

28 U.S.C. § 2254(d) provides the legal standards for this Court's consideration of the merits of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693-94 (2002). This Court's ability to grant a writ is limited to cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme

---

[2]Petitioner's direct appeal claims were heard via a postconviction *Lozada* petition, in conjunction with his postconviction petition for habeas relief. (*See* Exs. 45, 60, 86.)

Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254 "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Andrade*, 538 U.S. 63 (first quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); then citing *Bell*, 535 U.S. at 694).

A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Andrade*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409). The state courts' decisions on the merits are entitled to deference under AEDPA and may not be disturbed unless they were ones "with which no fairminded jurist could agree." *Davis v. Ayala*, 135 S. Ct. 2187, 2208 (2015).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual

determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." *Id.* at 973. Rather, AEDPA requires substantially more deference:

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

### B.     Procedural Default

When a claim is procedurally defaulted, the Court may consider the claim only if "a constitutional violation has probably resulted in the conviction of one who is actually innocent," or if the prisoner demonstrates cause for the default and prejudice resulting from it. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Murray*, 477 U.S. at 488. For cause to exist, the external impediment must have prevented the petitioner from raising the claim. *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991). With respect to the prejudice prong, the petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Ineffective assistance of post-conviction counsel can provide a basis for cause in some circumstances. *Martinez v. Ryan*, 566 U.S. 1 (2012). In *Martinez*, the United States

1   Supreme Court created a narrow, equitable rule that allows petitioners to, in some cases,

2   establish cause for a procedural default where the failure to raise a substantial claim of

3   ineffective assistance of trial counsel in initial-review collateral proceedings is due to the

4   absence or ineffective assistance of post-conviction counsel. *Id.* at 16-17. The *Martinez*

5   rule is an exception to the general rule that errors of post-conviction counsel cannot

6   provide cause for a procedural default. *Coleman*, 501 U.S. at 752-54; *Smith v. Baldwin*,

7   510 F.3d 1127, 1146-47 (9th Cir. 2007). *Martinez* provides an exception only for

8   substantial claims of ineffective assistance of trial counsel. It cannot supply cause to

9   excuse the procedural default of a substantive claim of trial court error. *See Martinez*, 566

10  U.S. at 16-17.

11  **III.    ANALYSIS**

12      **A.    Ground 1**

13      In Ground 1, Petitioner asserts that his Fifth and Fourteenth Amendment due

14  process rights were violated because insufficient evidence supported his convictions of

15  murder and attempted murder beyond a reasonable doubt.[3] (ECF No. 67 at 10.) The

16  Nevada Supreme Court addressed this claim as follows:

> Second, appellant argues that there was insufficient evidence presented to convict him of both first-degree murder and attempted murder. At trial, multiple witnesses testified that appellant first displayed a weapon and soon after shot two unarmed victims, while one had both hands displayed to show he was not armed and the other was sitting in his vehicle with his hands on the steering wheel. Further, the incident was recorded by a police officer conducting unrelated surveillance of the area and the recording was played for the jury. Based on this evidence, we conclude that the State met the elements of first-degree murder and attempted murder and a reasonable juror could have been convinced of appellant's guilt beyond a reasonable doubt.

23  (ECF No. 107 at 2.) Neither the Nevada Supreme Court's legal conclusion nor its factual

24  findings were objectively unreasonable.

25  ///

---

26  [3]"Attempted murder is the performance of an act or acts which tend, but fail, to kill
27  a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill." *Keys v. State*, 766 P.2d 270, 273 (Nev. 1988). "Murder of the first degree is murder which is perpetrated by means of any kind of willful, deliberate, and
28  premeditated killing." *Byford v. State*, 994 P.2d 700, 714 (Nev. 2000).

9

A federal court collaterally reviewing a state court conviction for sufficiency of the evidence does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir.1992). Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis original). The *Jackson* standard "looks to whether there is sufficient evidence which, if credited, could support the conviction." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). That is, "faced with a record of historical facts that supports conflicting inferences" the court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *McDaniel v. Brown*, 558 U.S. 120, 133 (2010).

Petitioner argues that the evidence did not show he deliberated or had the specific intent to kill or that he premeditated. To the contrary, he asserts that the evidence establishes only that he reacted, without deliberation, in response to a threat from the victims. (ECF No. 67 at 10-13.)

To make this argument, Petitioner challenges as unreasonable the state courts' factual findings. Petitioner argues that it was unreasonable to conclude that Gonzalez was unarmed because a bat was found on the passenger floorboard of the car and Gonzalez may have been trying to reach it. He further argues that it was unreasonable to find that Gonzalez's hands were on the steering wheel when shot because the latter was supported by the testimony of only one witness. And he argues it was unreasonable to find that Petitioner flashed a gun, because that too was supported by the testimony of only one witness. (*Id.* at 13-14.) Petitioner additionally argues that any finding Petitioner was threatening the victims is contrary to the evidence, because the victims would not have driven back toward Petitioner's group if they were threatened, and Petitioner was on his cell phone when the second confrontation was taking place.

///

The state court's factual findings were not objectively unreasonable. Even assuming Gonzalez was reaching for a bat at the time he was shot, there is no evidence he had the bat in hand when Petitioner fired, so the finding that all the victims were unarmed was not unreasonable. And a factual finding is not unreasonable merely because it is supported by the testimony of only one witness, particularly where, as in this case, few other witnesses would have been positioned to see the same thing—here, Gonzalez's hands on the steering wheel or the flash of Petitioner's gun.

Accepting these factual findings as objectively reasonable, it certainly was not objectively unreasonable for the state courts to find sufficient evidence to support Petitioner's convictions. The Nevada Supreme Court has explained:

> Deliberation is the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for and against the action and considering the consequences of the action. A deliberate determination may be arrived at in a short period of time . . . [but] must not be formed in passion, or if formed in passion, . . . must be carried out after there has been time for the passion to subside and deliberation to occur. A mere unconsidered and rash impulse is not deliberate. . . .

*Byford*, 994 P.2d at 714. "Premeditation is a design, a determination to kill, distinctly formed in the mind by the time of the killing. . . . It may be as instantaneous as successive thoughts of the mind." *Id.*

"Evidence of premeditation and deliberation is seldom direct." *Leonard v. State*, 17 P.3d 397, 411 (Nev. 2001). "Circumstantial evidence may be considered and provide sufficient evidence to infer" the elements of premeditation and deliberation. *Id.*; *see also United States v. Begay*, 673 F.3d 1038, 1043 (9th Cir. 2011) ("Premeditation can be proved by circumstantial evidence."). "[T]he intention to kill may be ascertained or deduced from the facts and circumstances of the killing, such as the use of a weapon calculated to produce death, the manner of the use, and the attendant circumstances characterizing the act." *Washington v. State*, 376 P.3d 802, 808 (Nev. 2016). Circumstantial evidence of premeditation may include bringing a weapon to the scene of the crime, *see Leonard*, 17 P.3d at 411; *United States v. Begay*, 673 F.3d 1038, 1044 (9th Cir. 2011) ("Carrying the murder weapon to the scene is strong evidence of

premeditation."), not acting rushed or agitated, *United States v. Reza-Ramos*, 816 F.3d 1110, 1123-24 (9th Cir. 2016), shooting at close and "thus predictably fatal" range, *Jackson*, 443 U.S. at 325, and firing multiple shots, *id.*

Viewing the evidence in the light most favorable to the prosecution, a reasonable juror could have found that Petitioner shot both Gonzalez and Perez with the deliberate intention to kill. The evidence showed that Petitioner brought a gun to Hurricane Harry's on the evening of October 11, 2003, and initiated a confrontation by flashing the gun. While it was Gonzalez, and not Petitioner, who reinitiated the confrontation after it had resolved peacefully, Petitioner apparently remained motivated by the same aggressive animus, as he goaded the occupants of Gonzalez's car by signaling to the gun in his waistband and asking repeatedly, "Do you want some?" Further, Petitioner shot Perez, who was not moving quickly and was completely and obviously unarmed, directly in the middle of his body. Three seconds elapsed before he again pulled the trigger, shooting Gonzalez twice, at close range. Petitioner stepped away briefly before he approached the car again to look inside. Petitioner then walked to Sanchez's car and directed Sanchez to go.

In light of this evidence, a reasonable juror could conclude beyond a reasonable doubt that Petitioner shot Perez with the specific intent to kill. He initiated a confrontation, escalated the confrontation, and then shot an unarmed and unthreatening Perez directly in the middle of the body. At a minimum the Nevada Supreme Court was not unreasonable in concluding that this evidence was sufficient to support a finding of deliberation and specific intent with respect to Perez.

It was likewise reasonable to conclude Petitioner premeditated and deliberated the murder of Gonzalez in the three seconds after shooting Perez before shooting Gonzalez, if not before. Petitioner's conduct before and after the shooting is circumstantial evidence of both. Little supports Petitioner's claim that he was reacting, without deliberation, to a threat of harm. To the contrary, the evidence suggests there was no threat of harm and Petitioner was not concerned about any such threat. He waited three seconds before

turning his gun on Gonzalez, which would be a considerable delay in the face of imminent harm. Petitioner shot Gonzalez at close range, stepped back, and a few seconds later stepped again toward the car to look inside the driver's window. Petitioner was unhurried as he returned to Sanchez's car. Absent a threat, Petitioner's actions are reasonably interpreted as demonstrating a premeditated and deliberate intent to kill Gonzalez. At a minimum, it was not objectively unreasonable for the Nevada Supreme Court to find as much.

Petitioner has not established that the state courts' legal and factual findings were objectively unreasonable and is not, therefore, entitled to relief on Ground 1 of the petition.

## B. Ground 2

In Ground 2, Petitioner asserts that his Fifth and Fourteenth Amendment rights were violated because there was insufficient evidence to find he did not act in self-defense. (ECF No. 67 at 15.) The Nevada Supreme Court addressed this claim as follows:

> Third, appellant argued that the State failed to prove beyond a reasonable doubt that appellant's actions were not done in self-defense. The evidence presented at trial demonstrated that appellant shot two unarmed males and did so without legal justification. . . . In addition, the evidence at trial demonstrated that appellant was not confronted with the appearance of imminent danger which aroused in his mind an honest belief and fear that he was about to be killed or suffer great bodily injury. . . . Finally, the evidence presented at trial indicated that appellant was the original aggressor, and the right of self-defense is ordinarily not available to an original aggressor.

(ECF No. 107 at 2.) These determinations were not objectively unreasonable.

Petitioner argues that it was Gonzalez who continued or escalated the altercation by driving his car over to Petitioner's group, and that Petitioner merely reacted once Perez got out of the car. While this is certainly one reasonable way to interpret the evidence, it is not the only reasonable way. Not only was there virtually no evidence Petitioner faced an actual threat, as just discussed, Petitioner's behavior circumstantially suggests that he did not perceive a threat, either. Further, for the reasons also just discussed, it was not unreasonable for the state courts to have found Petitioner was the initial aggressor. Thus, ///

1  even if Gonzalez had been reaching for a bat in the car, the reasonable finding that
2  Petitioner was the initial aggressor precludes a finding of self-defense.

3       Sufficient evidence supported the jury's conclusion that Petitioner did not act in
4  self-defense. At a minimum, it was not objectively unreasonable for the state courts to so
5  conclude. Petitioner is not therefore entitled to relief on Ground 2 of the petition.

6       **C.     Ground 3**

7       In Ground 3, Petitioner asserts that the State violated his rights to due process and
8  a fair trial when the prosecutor committed misconduct during closing arguments. (ECF
9  No. 67 at 17.) Specifically, Petitioner objects to the prosecutor's following statements: (1)
10  "[S]hooting someone, alone, indicates an intent to kill. When you point a gun at someone
11  and fire, your intention is to kill – to kill them;" (2) "[W]hen you shoot someone twice,
12  obviously you are intending to kill them;" and (3) that Gonzalez's aggression toward
13  Petitioner did not "legally change the conduct of the defendant." The Nevada Supreme
14  Court addressed this claim as follows:

> Fourth, appellant argues that the State committed prosecutorial misconduct
> during closing arguments by stating that pointing a gun at someone shows
> an intent to kill and that the victims' actions during the incident did not
> support appellant's claim of self-defense. The evidence presented at trial
> demonstrated that appellant displayed his gun, then later pointed the
> weapon and shot the two unarmed victims. Thus, the challenged statements
> were reasonable inferences drawn from the evidence presented at trial and,
> therefore, were proper.

20  (Ex. 107 at 3.)

21       A defendant's constitutional right to due process of law is violated if the
22  prosecutor's misconduct renders a trial "fundamentally unfair;" thus, a prosecutor's
23  improper comments amount to a constitutional violation if they "so infected the trial with
24  unfairness as to make the resulting conviction a denial of due process." *Darden v.*
25  *Wainwright*, 477 U.S. 168, 181-83 (1986). However, even if there was a constitutional
26  violation, a petitioner is entitled to relief only if he was actually prejudiced by the
27  comments. *Id.* (first citing *Ayala*, 135 S. Ct. at 2197; then citing *Brecht v. Abrahamson*,
28  507 U.S. 619, 627, 637 (1993)). Comments cause actual prejudice if they had a

"substantial and injurious effect or influence on the jury's verdict." *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012). "Under this test, relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'" *Ayala*, 135 S. Ct. at 2197-98 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

Claims of prosecutorial misconduct are reviewed "on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citation and internal quotation marks omitted).

Petitioner argues that the prosecutor's comments created a mandatory presumption that compelled the jury to find intent. He argues that because it was undisputed that Petitioner shot the gun, the State was relieved of its burden to prove intent. Respondents argue that when viewed in the context of all the argument, it is clear nothing improper was said. Further, they assert, the jury was instructed on the elements of the charged crimes, so the jurors were not misled.

Having read the entirety of the prosecutor's closing arguments, the Court is not persuaded that the state courts were objectively unreasonable in concluding that the prosecutor's statements did not violate Petitioner's right to due process and a fair trial. As Respondents argue, the context is important. While the prosecutor asserted that shooting someone indicates an intent to kill, he did not rely on this statement alone to argue that Petitioner intended to kill. Rather, the prosecutor elaborated that the evidence showed Petitioner intended to kill because he shot Perez at close range directly into the center of his body, where substantial harm was likely to occur. The prosecutor's statement that "obviously" Petitioner intended to kill Gonzalez because he shot him twice was a fair comment on the circumstantial evidence of the case showing Petitioner's intent. Finally, the prosecutor did not say that Gonzalez's "aggression" did not legally change Petitioner's conduct; he argued that Gonzalez telling Petitioner he did not like him flashing the gun did not change Petitioner's conduct. Aside from Sanchez's somewhat speculative

testimony, no other trial testimony supported an inference that Gonzalez was behaving aggressively toward Petitioner or otherwise posing a threat to Petitioner's safety. It was therefore fair for the prosecutor to argue that nothing in Gonzalez's conduct justified Petitioner's reaction of shooting to kill. At a minimum, the Court cannot conclude that any of the prosecutor's statements had a "substantial and injurious effect on the jury's verdict," or that the state courts were unreasonable in so concluding.

Petitioner is not entitled to relief on Ground 3 of the petition.[4]

## D.    Ground 4

In Ground 4, Petitioner asserts several claims of ineffective assistance of trial counsel. (ECF No. 67 at 18.)

Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must satisfy two prongs to obtain habeas relief—deficient performance by counsel and prejudice. 466 U.S. at 687. With respect to the performance prong, a petitioner must carry the burden of demonstrating that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Id.* at 688. "'Judicial scrutiny of counsel's performance must be highly deferential,' and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citation omitted). In assessing prejudice, the court "must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent [counsel's] errors." *Strickland*, 466 U.S. at 696.

### 1.    Paragraph 1

In Paragraph 1, Petitioner asserts that Lucherini spent very little time preparing for trial and almost no time investigating. Although Lucherini initially indicated he could be ready for a trial in less than 60 days, he asked for a continuance on the eve of trial, which

---

[4]Petitioner's assertion that, if given an evidentiary hearing, he would testify that he never said "f[***] Mexicans" because he doesn't' feel that way about Mexicans, is irrelevant. Whether Petitioner said "f[***] Mexicans" does not change the overall weight and evaluation of the evidence and whether the prosecutor's statements about it were fundamentally unfair or caused Petitioner actual prejudice.

16

was denied. Lucherini therefore had less than 60 days to prepare for trial. (ECF No. 67 at 18.) Respondents argue that there is nothing in the record to show that counsel was not prepared to go to trial or that more time would have made a difference. Applying the *Strickland* standard, the Nevada Supreme Court addressed this claim as follows:

> First, appellant argues that his trial counsel was ineffective for having less than 60 days to prepare for trial following his appointment. Appellant failed to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. Prior to trial, counsel informed the district court that he was ready to proceed to trial and nothing in the record indicated that this statement by counsel was untrue. Further, given the overwhelming evidence of appellant's guilt, appellant fails to demonstrate a reasonable probability that the outcome of trial would have been different had counsel had more time to prepare for trial and appellant provides no evidence that he was prejudiced by the length of the time to prepare for trial. Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.

(Ex. 107 at 4.) The state courts' conclusion was not objectively unreasonable.

The state courts were not objectively unreasonable in concluding that Petitioner had not shown any prejudice or deficient performance with respect to the shortened timeline counsel had to prepare for trial. The case had been pending, and investigated by prior counsel, for more than two years. Petitioner asserts elsewhere that the result of those investigations were part of the file Lucherini received. Petitioner has not established that counsel was not prepared within the 60-day time period he had or that the outcome of the proceedings would reasonably likely have been different had he conducted further investigations.

Petitioner is not entitled to relief under Paragraph One.

### 2. Paragraph 2

In Paragraph 2, Petitioner asserts that the file shows trial counsel did little before trial, filing only two things with the court—a lay witness list and an expert witness list, which included two gang experts and one psychologist. (ECF No. 67 at 19.)

As noted in the Court's prior order, this claim is procedurally defaulted. Petitioner asserts cause and prejudice for the default based on *Martinez.*. (*See* ECF No. 67 at 34-37.) The Court finds that Petitioner has not established either that this claim is a

substantial claim of ineffective assistance of trial counsel or that postconviction counsel was ineffective for failing to raise it. Standing alone, Paragraph Two does not identify what else counsel should have done or how it impacted the outcome of the proceedings. Although Petitioner raises specific allegations in the other paragraphs of Ground 4, those allegations are addressed in the context of the claim in which they are raised. Paragraph 2, standing alone, is not a substantial claim of ineffective assistance that postconviction counsel was ineffective for failing to raise.

Paragraph 2 is thus procedurally defaulted.

### 3. Paragraph 3

In Paragraph 3, which is also procedurally defaulted, Petitioner asserts that while trial counsel prepared and filed subpoenas for all three proposed experts, he failed to contact any of them. He argues that the two gang experts could have "explained gang activity to the jury and how gang activity impacts a gang member's reasonable perception of a threat." (ECF No. 67 at 19.) He argues the psychologist, Dr. Thomas Kinsora, could have explained the mitigating factors in Petitioner's background. (*Id.*)

Respondents argue that counsel reasonably, and likely to Petitioner's benefit, did not pursue a "risky and dangerous" gang theory, which would have introduced evidence that Petitioner was a gang member with a violent and angry history that included past criminal convictions, including sex offenses. They argue that the proposed testimony would have opened the door for a great deal of extremely harmful evidence by the State on rebuttal, evidence that would have portrayed Petitioner as "a sociopathic, angry and violent repeat offender." (ECF No. 88 at 20.)

Petitioner replies that a gang expert would not have been as prejudicial as Respondents claim and it would have supported his self-defense argument. Further, Petitioner argues that he was not as violent as Respondents suggest, as he was never convicted of the most violent charges against him and was adjudicated only of lesser offenses.

///

Having considered the record, the Court is persuaded that while this claim is perhaps substantial, and without deciding whether postconviction counsel was ineffective for failing to raise it, Petitioner nonetheless has not suffered any prejudice and therefore the claim is without merit. While Petitioner argues that the evidence regarding gang confrontations would have bolstered his argument that he acted without deliberation to a threat, the evidence was that Petitioner was the one who initiated the confrontation, including its gang overtones, and pursued it until it ended in gunfire. Not only is there no reasonable likelihood that the jury would have found Petitioner guilty of less than first degree murder in light of the evidence, some of the evidence would have made it even easier to conclude that Petitioner came to Hurricane Harry's looking for a fight. For these reasons, Petitioner can establish neither that counsel was deficient for failing to call gang experts nor resulting prejudice.

Insofar as Dr. Kinsora is concerned, Petitioner has offered no evidence as to what Dr. Kinsora's conclusions would have been and has, therefore, failed to establish either deficient performance or prejudice.

Accordingly, even assuming Petitioner has shown cause, he has not shown prejudice to excuse the default of paragraph three and has not shown he would be entitled to relief on the merits of this claim.

Paragraph 3 is procedurally defaulted.

### 4. Paragraph 4

In Paragraph 4, Petitioner asserts that trial counsel was ineffective for failing to call, during the guilt and penalty phases, Dr. John Paglini, who had evaluated Petitioner for his prior counsel. Petitioner asserts that Dr. Paglini could have testified to mitigation factors that lessened Petitioner's moral culpability for the offense. (ECF No. 67 at 19-20.)

Respondents argue the mitigation evidence was introduced through Petitioner's uncle's testimony in the penalty phase. They further argue that Dr. Paglini had drawn negative conclusions about Petitioner—including that he had intense rage and anger toward society—which would have harmed his defense.

The trial court addressed this claim as follows:

> Counsel's decision not to call Dr. Paglini to testify in mitigation at sentencing was a strategic decision. The report was replete with instances of unfavorable admissions by Defendant to Dr. Paglini of prior violent crimes committed by him that showed his propensity toward violence. Specifically, Dr. Paglini wrote in his report that Defendant suffered from a "macho disposition that resulted from intense rage and anger towards society" and that he was, therefore, at a high risk for being violent in the future, and such a conclusion by a licensed Psychologist would have worked to Defendant's detriment in both the guilt and penalty phases.

(Ex. 86 at 7 (internal citations and footnote omitted).) The Nevada Supreme Court held as follows:

> Fourth, appellant argues that his trial counsel was ineffective for failing to call Dr. John Paglini to testify at the penalty hearing to present mitigation evidence about appellant's family history. Appellant fails to demonstrate that he was prejudiced. At the penalty hearing, appellant's uncle testified extensively about appellant's family history of drug abuse and violence. Further, Dr. Paglini's report indicated that appellant was at a high risk to be involved with violence and that appellant had intense anger and rage towards society. Given the nature of Dr. Paglini's report and that any information about appellant's family history would have been duplicative of testimony provided by appellant's uncle, appellant fails to demonstrate a reasonable probability that the outcome of the penalty hearing would have been different had Dr. Paglini been called to testify. Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.

(Ex. 107 at 5-6.)

Describing Petitioner's life as "replete with mitigation," Dr. Paglini identified five mitigating factors in Petitioner's background. (Ex. 122 at 14.)[5] They were:

> 1. <u>Parental substance abuse</u>: Mr. Lopez's biological father was a drug addict and alcoholic. Mr. Lopez's biological mother had a seventeen year addiction to crystal methamphetamine. Mr. Lopez's first stepfather, Theodore Vasquez, was a severe alcoholic. Mr. Lopez's second stepfather sold all kinds of drugs.
>
> 2. <u>Parental criminal behavior</u>: Mr. Lopez's biological father was incarcerated when Mr. Lopez was four years old, for chopping off the finger of his wife's boyfriend. He was incarcerated for approximately five years, and released. He then violated and spent numerous more years in prison. Mr. Ricardo Lopez believed that his father is in prison for forty years currently. Mr. Lopez's stepfather, Theodore Vasquez, was frequently incarcerated for domestic violence for his mother, and DUIs. Mr. Lopez's second stepfather, Mr. Bernardo Akan, sold drugs and modeled this behavior to the children.

---

[5]Citation is to original page of document.

Additionally Mr. Lopez's mother used drugs. Hence, what was modeled in the home was drug usage, and criminal behavior.

3. Abuse/neglect: Mr. Lopez was physically abused by his biological father. Mr. Lopez had witnessed domestic violence in the home, as he had seen his biological father beat his mother and on one occasion his biological father shot a gun at his mother. Mr. Lopez's father went away for attempting to murder his mother.

Mr. Lopez reported that his stepfather, Mr. Theodore Vasquez was extremely physically abusive towards his mother, and well as the children. Mr. Lopez was beaten with cords, sticks, and belts. Mr. Lopez described the abuse, and was exceptionally tearful, as he recounted these issues. This was confirmed by his oldest brother, Carlos, as well as his maternal uncle, Mr. Rosa. Hence, what is evident, is Mr. Lopez experienced a tremendous amount of domestic violence from birth to approximately the age of 11 or 12. This obviously had a significant psychological impact on how he developed as a person. As such, what was modeled for him was aggression and criminal behavior. Mr. Rosa, maternal uncle, reported that although he loves his sister, Ricardo's mother, he acknowledged that not only was she a drug addict, but she never disciplined her children.

4. Poor parental management: This is illustrated by his biological parents and stepfathers/mother's boyfriends. Mr. Lopez was either beaten, neglected, and there was no positive modeling to help him interact with society in a healthy way.

5. Community disorganization: Mr. Lopez lived in a few communities, with high crime rates, and also in impoverished conditions.

(Ex. 122 at 14-15.)

In addition to its details of abuse, the report included Petitioner's admissions to gang involvement and frequent fights, possession of weapons, theft of weapons, and firing of gunshots. (*Id.* at 6-9.) The report also included a discussion of the kidnapping and sexual assault charges against Petitioner. According to Petitioner, the rape charge was fabricated by the victim after he rejected her sexually, they got into a scuffle, he pushed her, and she hit her head. Petitioner asserted that even the victim's brother supported his version of events. (*Id.* at 7.)

Dr. Paglini ultimately concluded that Petitioner was "the product of an abusive, neglectful substance abuse environment" and as such had "turned into an angry young man," though he noted that "[u]nderneath [Petitioner's] anger obviously is depression." (*Id.* at 15.) Dr. Paglini concluded that it was not surprising Petitioner had committed the violent act, as he was at high risk to do so and that the "act occurred likely because of his

macho disposition, that resulted from intense anger and rage towards society, that evolved because of his own abuse and neglect." (*Id.* at 16.) Dr. Paglini further concluded, however, that:

> Forensic psychological research has indicated that criminality/violence deteriorates as a defendant ages. Mr. Lopez does have a history of violence that preceded this murder. This murder occurred when Mr. Lopez was 20 years/3 months old. Neuropsychological research indicates the brain continues to develop and mature until the age of 25. Forensic psychological research indicates that criminality declines with age. Hence, if Mr. Lopez received a first degree murder sentence, and was released after forty years, the forensic psychological research with criminals indicates that their ability to act out towards society after the age of 60, is extremely low. As illustrated, from a risk perspective, if Mr. Lopez is released at the age of 61, and also exhibited an adequate adjustment to incarceration, his potential for violence would have decreased significantly throughout the years.

(*Id.* at 15.)

### a.    Guilt Phase

The state courts were not objectively unreasonable in finding no ineffective assistance of counsel from the failure to introduce Dr. Paglini during the guilt phase. During the guilt phase, Dr. Paglini's findings were more likely to have harmed Petitioner than to have helped him—at the least, it was not outside the wide range of reasonable representation for counsel to determine that introduction of this evidence was not in Petitioner's best interest. Dr. Paglini found that Petitioner was an "angry young man" whose "intense anger and rage toward society" meant that he'd had a high risk of being involved in violence. (Ex. 122 at 15-16.)[6] Such findings were undoubtedly risky to present during the guilt phase, particularly where Petitioner was pursuing a strategy of self-defense. Petitioner therefore has not established a reasonable likelihood that Dr. Paglini's findings would have influenced the outcome of the guilt phase or that counsel was deficient for failing to introduce this only slightly helpful, and potentially very damaging, evidence during the guilt phase. The state courts' rejection of this claim was not therefore contrary to, or an unreasonable application of, clearly established federal law.

///

---

[6]Citation is to original page of document.

### b. Penalty Phase

Counsel's performance at the penalty phase was deficient if, measured against "prevailing professional norms," it "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Doe v. Ayers*, 782 F.3d 425, 444 (9th Cir. 2015). "In making this determination, the Court must avoid the temptation to second-guess [counsel's] performance or to indulge 'the distorting effects of hindsight.'" *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001). The Court can find counsel's "performance deficient only if, viewing the situation from his perspective at the time of trial, his decisions cannot be characterized as 'sound trial strategy.'" *Id.*

Strategic choices made among plausible options after thorough investigation of the facts and applicable law are "virtually unchallengeable." *Strickland*, 466 U.S. at 690; *see also Correll v. Ryan*, 539 F.3d 938, 948 (9th Cir. 2008) ("[U]nder *Strickland*, we must defer to trial counsel's strategic decisions."). But judicial deference to counsel is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments." *Mayfield*, 270 F.3d at 927. Strategic choices that follow an investigation that is less than complete are reasonable only if the decision to limit investigation is itself a reasonable professional judgment. *Strickland*, 466 U.S. at 691. Accordingly, "when a petitioner challenges trial counsel's conduct in not presenting mitigation evidence at the penalty phase, [the] 'principal concern . . . is not whether counsel should have presented a mitigation case[, but instead] whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable.'" *Avena v. Chappell*, No. 14-99004, 2019 WL 3720177, at *8-9 (9th Cir. Aug. 8, 2019).

However, "[e]ven if [a] decision could be considered one of strategy, that does not render it immune from attack-it must be a *reasonable* strategy." *Correll*, 539 F.3d at 948 (alterations in original) (quoting *Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir. 1997)).

Here, because the state courts did not conduct an evidentiary hearing, it is unclear what investigation Lucherini performed. But because there has been no evidence to suggest otherwise, it can be inferred that Dr. Paglini's report was part of Petitioner's file and that counsel reviewed the report to determine whether it would be worthwhile to use. The question thus becomes whether counsel's decision not to call Dr. Paglini was a reasonable strategic decision to which this Court, and the state courts, must defer.

The trial court found that counsel had reasonable strategic reasons for not introducing Dr. Paglini or his report, including that the report contained a significant history of admitted violence that exceeded and was more detailed than the limited criminal history presented by the State during the penalty hearing. The court found that this prejudicial information far outweighed the relatively minor useful information from Dr. Paglini that Petitioner would be a lower risk of violence after 40 years, which the trial court opined was actually just common sense. (Ex. 83 (Tr. 82-85); Ex. 86 at 7.)

The Court finds both the state courts' conclusion and counsel's presumed strategic decision to be objectively unreasonable. While the report did contain a slew of admissions to violent, dangerous conduct, much of this came through during the penalty phase in the presentation of Petitioner's various arrests and adjudications. While the report was certainly more extensive, it is also reasonably likely that the jury had already decided Petitioner was a violent, unpredictable individual because it found him guilty of first degree, premeditated murder of a complete stranger. There was little to be lost, then, from the presentation of Dr. Paglini's report and/or testimony. By the same token, there was much to be gained. First, the mitigation evidence in Dr. Paglini's report was far more detailed than that provided by Petitioner's uncle. Second, Dr. Paglini offered an expert opinion that Petitioner was likely to be a low risk of violence after 40 years. Where the only choice the jury had, in effect, was whether to give Petitioner the possibility of parole

///

///

///

after 40 years,[7] it was not a reasonable strategic decision for counsel to forgo Dr. Paglini's expert opinion. The Court further concludes the state courts were objectively unreasonable in finding that counsel's performance was not deficient. The testimony of a trained professional about a reduction in violence risk over time is significantly more persuasive than a "common sense"—*i.e.*, unsupported—notion that violence decreases with age. It was objectively unreasonable for the state courts to equate Dr. Paglini's expert opinion to "common sense."

For much the same reasons, the state courts were objectively unreasonable in finding no prejudice from this failure. As noted, the Court is not persuaded that the damaging information in Dr. Paglini's report would have had as significant an impact as the state courts found, especially because the mitigation evidence itself was also more extensive. And critically, if the jury had been given Dr. Paglini's opinion regarding Petitioner's likely risk of violence, there is certainly a reasonable likelihood that the outcome of the proceedings would have been different, *i.e.*, that the jury would have opted to give Petitioner the chance at parole. It is, furthermore and importantly, objectively unreasonable to conclude otherwise. Therefore, despite the AEDPA deference due this claim, the Court finds the state courts' resolution thereof was an unreasonable application of clearly established federal law.

Petitioner therefore will be granted relief pursuant to Paragraph Four, Ground 4(A) of the petition.

### 5. Paragraph 5

In Paragraph 5, Petitioner asserts that counsel should have introduced Petitioner's brothers and uncle to explain that Petitioner's violent and abusive homelife and his involvement with a gang caused him to react immediately to threats without deliberation or intent, and to explain why Petitioner reasonably perceived Perez as posing a threat. ///

---

[7]As previously noted, the jury could have sentenced Petitioner to life without the possibility of parole, life with the possibility of parole after 40 years, or a definite term of 100 years with the possibility of parole after 40 years.

(ECF No. 67 at 20, 22-29.) Petitioner also asserts his brothers could have explained the story behind his violent offenses during the penalty phase, in order to explain why he was not really guilty. (*Id.* at 29-31.)

This claim is procedurally defaulted, and so Petitioner must demonstrate cause and prejudice for its default. As with the other defaulted claims, Petitioner relies on *Martinez.*

Petitioner asserts that his brother, Roque Lopez, could have explained the sexual assault charges by telling the jury that the victim manufactured the story after Petitioner rejected her romantically. (Ex. 125.) Specifically, in 2011, Roque Lopez has declared:

> Ricky first went to jail for raping a girl but he did not do it. The girl was crazy in love with Ricky. She was older than him. She was hanging around him and grabbing him. He pushed her real hard and she fell back and cut her head on a wall. She told her mom he raped her but he didn't. I saw her grabbing him and him push her.

(Ex. 125 at 2.)[8] Petitioner's other brother, Carlos Lopez, also declared, in 2011, that Petitioner "didn't rape the girl. He hit her and she got pissed and said he raped her." (Ex. 126 at 2.)[9] Second, Carlos Lopez would have testified that just before the riot, Petitioner called him and told him that "some of the kids were getting raped by the guards." (Ex. 126 at 3.)[10]

Petitioner was not convicted of the sexual crimes with which he was charged, and the jury was told as much. While further explication could have dispelled the clear impression the jury was left with—that Petitioner committed kidnapping and sexual assault but somehow got off the hook—Petitioner has not established that postconviction counsel was or should have been aware that either of Petitioner's brothers had useful testimony with respect to this crime. Nor has Petitioner established that postconviction counsel was or should have been aware that Carlos had any information about the reason

///

---

[8]Citation is to original page of document.

[9]Citation is to original page of document.

[10]Citation is to original page of document.

for the detention center riot. Petitioner therefore has not met his burden of establishing cause for the procedural default of this claim.

Petitioner is not entitled to relief on Paragraph 5.

### 6. Paragraph 6

In Paragraph 6, Petitioner asserts that trial counsel failed to thoroughly discuss the offense with him and that they met at most twice before trial. (ECF No. 67 at 20.) Petitioner asserts that had they met more often or discussed the matters more thoroughly, trial counsel would have learned that Petitioner never intentionally flashed a gun at the victims. (*Id.*)

This claim is procedurally defaulted, and the threshold question is thus whether Petitioner has established cause and prejudice for the default. As with his other defaulted claims, Petitioner relies on ineffective assistance of postconviction counsel pursuant to *Martinez*, 566 U.S. 1. The Court concludes that Petitioner has not shown postconviction counsel was ineffective for failing to raise this claim. The only difference Petitioner identifies as stemming from more frequent or in-depth meetings would have been counsel learning from Petitioner that he never intentionally flashed a gun at anyone. It is unclear what Petitioner expects counsel would have done with this information. Petitioner does not assert that he would have testified as to this fact or explain how else it might have been introduced. In light of the other testimony at trial, in particular that Petitioner repeatedly signaled to his gun during the later confrontation, it is not reasonably likely that the jury would have been persuaded by argument from counsel that State had not established Petitioner intentionally flashed the gun. Given the weakness of this claim, postconviction counsel was not ineffective for failing to raise it. Petitioner not having argued any other basis for cause for the default, Paragraph 6 is procedurally defaulted.

### 7. Paragraph 7

In Paragraph 7, Petitioner asserts that trial counsel failed to review Perez's prior statements to impeach his trial testimony or serve as the basis for an expert opinion that Petitioner and Perez were involved in a gang confrontation. Specifically, Petitioner asserts

that Perez had previously stated that after he confronted Petitioner about flashing a gun, Petitioner asked where Perez was from and they both declared where they were from. Petitioner asserts that an expert could have explained that asking where a person is from is a common way to initiate a gang confrontation. (*See* Exs. 120, 130.)

As this claim is procedurally defaulted, Petitioner must establish cause and prejudice. Again, Petitioner relies on *Martinez*, 566 U.S. 1. And again, the Court finds that Petitioner has failed to establish that postconviction counsel was ineffective for failing to raise this claim. As previously discussed, focusing on Petitioner's gang involvement would have provided further evidence that Petitioner was responsible for initiating and escalating the confrontation, particularly as the evidence Petitioner points to is Perez's statement that it was *Petitioner* who first asked where Perez was from and thus it was Petitioner who made it a gang confrontation. Counsel probing into the gang overtures of the confrontation was not reasonably likely to have helped Petitioner, and given the apparent weakness of this claim, it was not ineffective for postconviction counsel to fail to pursue it. Petitioner has not therefore established cause for the default of Paragraph 7.

### E.    Deficient Performance at Trial

In Ground 4(B), Petitioner asserts trial counsel failed to object to the state's improper closing argument as discussed in Ground 3. Petitioner asserts that had trial counsel objected, there is a reasonable probability that the jury would have failed to find deliberation or intent or would have found that Petitioner reasonably acted in self-defense. (ECF No. 67 at 21.)

The Nevada Supreme Court addressed this claim as follows:

> Third, appellant argues that his trial counsel was ineffective for failing to object when the State committed prosecutorial misconduct during closing arguments. Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. As discussed previously, the challenged statements were reasonable inferences drawn from the evidence presented at trial and, therefore, were proper. Further, as there was overwhelming evidence of appellant's guilt, appellant fails to demonstrate a reasonable probability of a different outcome had his counsel objected to the challenged statements. Therefore, the district court did not err in denying this claim.

(Ex. 107 at 5.) The state courts' determination was not contrary to, or an unreasonable application of, clearly established federal law.

The state courts determined that even if counsel had objected, and even if the objection had been sustained, the outcome of the proceedings was not reasonably likely to have been different in light of the overwhelming evidence of Petitioner's guilt. In light of the evidence presented at trial, the Court cannot find this conclusion to be objectively unreasonable.

Petitioner is not entitled to relief on Ground 4(B).[11]

## IV.   CERTIFICATE OF APPEALABILITY

In order to proceed with an appeal, Petitioner must receive a certificate of appealability. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22; 9th Cir. R. 22-1; *Allen v. Ornoski*, 435 F.3d 946, 950-951 (9th Cir. 2006); *see also United States v. Mikels*, 236 F.3d 550, 551-52 (9th Cir. 2001). Generally, a petitioner must make "a substantial showing of the denial of a constitutional right" to warrant a certificate of appealability. *Allen*, 435 F.3d at 951; 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Allen*, 435 F.3d at 951 (quoting *Slack*, 529 U.S. at 484). In order to meet this threshold inquiry, the petitioner has the burden of demonstrating that the issues are debatable among jurists of reason; that a court could resolve the issues differently; or that the questions are adequate to deserve encouragement to proceed further. *Id.*

The Court has considered the issues raised by Petitioner, with respect to whether they satisfy the standard for issuance of a certificate of appealability, and with the exception of the claim on which the Court grants relief, determines that none other meets that standard. The Court will therefore deny Petitioner a certificate of appealability.

---

[11]Although Ground 4 has a third section entitled "prejudice," that section merely elaborates on the other claims in Ground 4 already discussed. The allegations in the "Prejudice" section have been considered and discussed in the context of the relevant claim to which they relate.

## V.    CONCLUSION

In accordance with the foregoing, it is therefore ordered that the second amended petition for writ of habeas corpus (ECF No. 67) is granted in part and denied in part. Petitioner is granted relief relative to the penalty phase of his trial, with respect to his claim in Ground 4, Paragraph 4, asserting ineffective assistance of counsel for failing to present Dr. Paglini during the penalty phase of Petitioner's trial. Petitioner is denied relief on all other claims in his second amended habeas petition.

It is further ordered that Respondents must either (1) within 60 days from the date of this order, vacate Petitioner's sentence of life without the possibility of parole and impose upon him, with respect to the first degree murder conviction, a sentence, consistent with law, providing for the possibility of parole after 40 years, or (2) within 60 days from the date of this order, file a notice of the State's intent to grant Petitioner a new penalty-phase hearing, and, within 180 days from the date of this order, commence jury selection in the new penalty-phase trial. Petitioner's sentence for the attempted murder conviction is not affected by this order.

It is further ordered that Petitioner is denied a certificate of appealability on all claims for which the Court denies relief.

It is further ordered that the Clerk of the Court is directed to enter judgment accordingly.

It is further ordered that the judgment in this action will be stayed pending the conclusion of any appellate or certiorari review in the Ninth Circuit Court of Appeals or the United States Supreme Court, or the expiration of the time for seeking such appellate or certiorari review, whichever occurs later.

DATED THIS 10th day of September 2019.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE